UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID RAVARINO, WILLIAM KENAN KELLY, HOLLY A. SMITH, JEANA ROSE BOLLINGER, JOHANNA LANGILLE, LAURA SHUR, LISA BISHOP LAMBERT, ALAN HOUSE, ERIKA HALLBERG and RYAN FUHRIMAN, on Behalf of Themselves, the Voya 401(k) Savings Plan, and All Others Similarly Situated, | No. <br><br>**COMPLAINT**<br><br>December 14, 2021 |
| Plaintiffs, | |
| v. | |
| VOYA FINANCIAL, INC., VOYA INSTITUTIONAL TRUST COMPANY, VOYA RETIREMENT INSURANCE AND ANNUITY COMPANY, VOYA INVESTMENT TRUST COMPANY, VOYA INVESTMENT MANAGEMENT CO. LLC, VOYA FINANCIAL PLAN ADMINISTRATIVE COMMITTEE, VOYA FINANCIAL PLAN INVESTMENT COMMITTEE, and DOES 1-30, | |
| Defendants. | |

Plaintiffs David Ravarino, William Kenan Kelly, Holly A. Smith, Jeana Rose Bollinger, Johanna Langille, Laura Shur, Lisa Bishop Lambert, Alan House, Erika Hallberg and Ryan Fuhriman (collectively, "Plaintiffs"), who are participants in the Voya 401(k) Savings Plan (hereafter the "Plan"), on behalf of themselves and a proposed class of all others similarly situated, and on behalf of and for the benefit of the Plan, allege as follows:

## INTRODUCTION

1.     This case is about a company's self-dealing at the expense of its own workers' retirement savings.  Defendants were required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et seq.*, to act solely in the interest of the Plan's participants when making decisions with respect to selecting, removing, replacing, and monitoring

the Plan's investments.  Rather than fulfilling these fiduciary duties, among the "highest [duties] known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982), by offering Plaintiffs and the other investors in the Plan only prudent investment options at reasonable cost, Defendants selected for the Plan and repeatedly failed to remove or replace a number of deficient proprietary retirement investment funds ("Voya Funds") managed and offered by Defendant Voya Financial, Inc. ("Voya" or the "Company") and/or its subsidiaries or affiliates.  These funds were not selected and retained for the Plan as the result of an impartial or otherwise prudent process, but were instead selected and retained by Defendants because they benefited financially from the inclusion of these options in the Plan.  By choosing and then retaining the Voya Funds as a core part of the Plan's investments to the exclusion of alternative investments available in the 401(k)-plan marketplace, Defendants enriched themselves at the expense of their own employees.  As discussed below, Defendants also breached their fiduciary duties by failing to consider the prudence of retaining certain other deficient investments that were inappropriate for the Plan during the Relevant Period, and by failing to monitor the Plan's administrative fees.  Defendants committed further statutory violations by engaging in conflicted transactions expressly prohibited by ERISA.

2.      This is a civil enforcement action under ERISA §§404, 406, 409, 502(a)(2), 29 U.S.C. §§1104, 1109, 1132(a)(2).  Plaintiffs bring this action on behalf of the Plan and its participants and their beneficiaries for losses to the Plan and for disgorgement of unlawful fees and profits taken by Defendants from December 2015 through the present ("Relevant Period").

## I.      JURISDICTION AND VENUE

3.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

5.     Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because certain of the Defendants reside in or may be found in this district and the Plan recordkeeper is located in this district.  Venue is also proper in this district pursuant to 28 U.S.C. §1391 because Defendants maintain their offices and conduct business in this district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this district.

## II.     PARTIES

### Plaintiffs

6.     Plaintiff David Ravarino is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Ravarino resides in Concord, California.  During the Relevant Period, Plaintiff Ravarino was invested in the Voya Target Index Solution Trust 2040 and the Voya Stable Value Option through his Plan account.

7.     Plaintiff William Kenan Kelly is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Kelly resides in Natick, Massachusetts.  During the Relevant Period, Plaintiff Kelly was invested in the Voya Target Index Solution Trust 2035 and the Voya Real Estate Fund through his Plan account.

8.     Plaintiff Holly A. Smith is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Smith resides in Walnut Creek, California.  During the Relevant Period, Plaintiff Smith was invested in the Voya Target Index Solution Trust 2045 and the Voya Stable Value Option through her Plan account.

9.     Plaintiff Jeana Rose Bollinger is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Bollinger resides in Flower Mound, Texas.  During

the Relevant Period, Plaintiff Bollinger was invested in the Voya Target Index Solution Trust 2040, the Voya Stable Value Option, and the Brown Advisory Small-Cap Growth Equity Portfolio through her Plan account.

10.     Plaintiff Johanna Langille is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Langille resides in West Des Moines, Iowa.  During the Relevant Period, Plaintiff Langille was invested in the Voya Target Index Solution Trust 2050 through her Plan account.

11.     Plaintiff Laura Shur is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Shur resides in Downingtown, Pennsylvania.  During the Relevant Period, Plaintiff Shur was invested in the Voya Target Index Solution Trust 2020, the Voya Small Cap Growth Trust Fund, the Voya Real Estate Fund, and the Voya Stable Value Option through her Plan account.

12.     Plaintiff Lisa Bishop Lambert is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Lambert resides in Windsor Locks, Connecticut. During the Relevant Period, Plaintiff Lambert was invested in the Voya Target Index Solution Trust 2030 through her Plan account.

13.     Plaintiff Alan House is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff House resides in Bloomfield, Connecticut.  During the Relevant Period, Plaintiff House was invested in the Voya Target Index Solution Trust 2035, the Voya Target Index Solution Trust 2030, the Voya Small Cap Growth Trust Fund, and the Voya Real Estate Fund through his Plan account.

14.     Plaintiff Erika Hallberg is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).  Plaintiff Hallberg resides in Windsor, Connecticut.  During the

Relevant Period, Plaintiff Hallberg was invested in the Voya Target Index Solution Trust 2035 through her Plan account.

15.     Plaintiff Ryan Fuhriman is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7).   Plaintiff Fuhriman resides in Jacksonville, Florida.   During the Relevant Period, Plaintiff Fuhriman was invested in the Voya Target Index Solution Trust 2045 through his Plan account.

**Defendants**

16.     Defendant Voya is a financial, retirement, investment and insurance company. Voya offers its products and services throughout the United States, including in this District, through a group of financial intermediaries, one of which is Voya Services Company, the Plan sponsor.[1]   As alleged below, Voya is also the corporate parent of the Plan recordkeeper and the Plan trustee, as well as the other entities named as Defendants herein that managed or advised certain Voya Funds challenged in this action during the Relevant Period.   Upon information and belief, the Company may appoint and remove members of the Voya Financial Plan Administrative Committee ("Administrative Committee") and the Voya Financial Plan Investment Committee ("Investment Committee").   During the Relevant Period, Voya, acting through *inter alia*, its directors, officers, committees, and employees, has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.   ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

17.     Defendant Voya Retirement Insurance and Annuity Company ("VRIAC") has served as the Plan recordkeeper during the Relevant Period.   Additionally, VRIAC is the issuer

---

[1]     Upon information and belief, the Plan sponsor is not a fiduciary or a service provider to the Plan as relevant to Plaintiffs' allegations, and as such, is not a named defendant here.  Plaintiffs reserve the right to name the Plan Sponsor as a defendant as may be warranted by further case developments, including any discovery to be had in this action.

of the group annuity contract that the Plan entered into and currently owns in connection with Voya's proprietary stable value investment option ("Voya Stable Value Option") discussed below. VRIAC is a wholly-owned subsidiary of Voya Holdings Inc., a Connecticut holding and management company, which in turn is a wholly-owned subsidiary of Voya.  VRIAC is located in Windsor, Connecticut.  VRIAC provides insurance products and financial services to customers in the United States.  During the Relevant Period, VRIAC has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

18.    Defendant Voya Institutional Trust Company ("VITC), a wholly-owned subsidiary of Voya, served as the Plan trustee at least for a portion of the Relevant Period. According to the Plan's Form 11-K for the fiscal year ended December 31, 2020 ("2020 Form 11-K")[2], effective February 15, 2018, the Plan sponsor terminated its trust agreement with VITC. Also, effective February 15, 2018, the Plan sponsor and its affiliate entered into a master trust agreement with VITC to facilitate the holding and investment of Plan assets as well as the assets of another 401(k) plan (sponsored by the affiliate) in one master trust that separately accounts for the respective interests of each plan. During the Relevant Period, VITC has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

19.    Defendant Voya Investment Trust Company ("Voya Investment Trust") is the investment adviser for Voya's so-called proprietary target date funds included in the Plan.  Voya Investment Trust is a wholly-owned subsidiary of Voya, and its line of business includes issuing shares, managing investments, and mutual fund sales.  Voya Investment Trust is located in

---

[2]    2020 Form 11-K is attached as Exhibit A hereto.

Windsor, Connecticut.  During the Relevant Period, Voya Investment Trust has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

20.     Defendant Voya Investment Management Co. LLC ("Voya Investment Management") manages the Voya Stable Value Option in the Plan.  Voya Investment Management is a wholly-owned subsidiary of Voya and is the asset management business of the Company.  During the Relevant Period, Voya Investment Management has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

21.     Defendant Administrative Committee is the Plan Administrator.  According to the Plan's Summary Plan Description ("SPD"), the Administrative Committee is the named fiduciary of the Plan.  During the Relevant Period, Defendant Administrative Committee, through its members, has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

22.     Defendant Investment Committee is charged with responsibility for the Plan investments. According to the Plan's SPD, the Investment Committee is the named fiduciary of the Plan.  During the Relevant Period, Defendant Investment Committee, through its members, has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

23.     Because Plaintiffs are currently unaware of the identities of the individual members of the Administrative and Investment Committees, as well as the individual employees of

Defendants Voya, VITC, VRIAC, Voya Investment Trust, and Voya Investment Management with responsibilities for Plan administration and management as relevant hereto, those individuals are collectively named as Defendant Does 1-30.  Plaintiffs will substitute the real names of the Does when they become known to Plaintiffs.  To the extent that Plan fiduciaries delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. §1002(21)(A) and is also alleged to be a Doe Defendant.

## III.   THE PLAN

24.     **Plan description**.  The Plan is an employee benefit plan within the meaning of ERISA §§3(3) and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A), and a defined contribution profit sharing plan within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

25.     **Eligibility**.  The Plan covers eligible employees of Voya, its subsidiaries, and affiliates.  All employees meeting the qualifying requirements are automatically enrolled in the Plan.  The Plan had over 11,400 participants and/or beneficiaries as of the end of the 2020 Plan year.

26.     **Participant accounts**.  The Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants that could be allocated to such participants' accounts.  Each participant's account is credited with the participant's contribution and the Company's contribution.  According to the 2020 Form 11-K, "*[p]articipant accounts may be reduced by any administrative fees or expenses charged against the account*."  [Emphasis added.]

27.     **Plan investments**.  During the Relevant Period, the Plan provided a designated set of options for investment of the Plan assets.  As such, Plan participants were allowed to direct the

Plan to purchase investments from only among the investment options available under the Plan and allocate them to their individual accounts.

28.     **Qualified default investment alternative**.  According to the Plan's SPD, Voya's proprietary target date funds serve as the Plan's qualified default investment alternative ("QDIA"). Specifically, "[i]f amounts are automatically contributed to the Plan for [participant] under the auto-enrollment feature, they will be invested in the target date lifecycle fund, based on the year in which [participant] turn[s] age 65," unless elected otherwise.

29.     **Concentrations of risk**.  According to the Plan filings with the U.S. Securities and Exchange Commission ("SEC"), throughout the Relevant Period, "the Plan's assets were significantly concentrated in Voya affiliated investments such as Voya mutual funds, Voya collective trusts, and Voya shares . . ."  *See*, *e.g.*, Exhibit A (2020 Form 11-K) at 7.

30.     **Parties-in-interest to the Plan**.  According to the 2020 Form 11-K, "[t]he Plan holds investments in several mutual funds, Voya shares, Voya collective investments trusts and GICs that are managed by affiliated companies of the Plan Sponsor."  Exhibit A at 20.  Further, "[t]hese affiliated companies are considered parties-in-interest (as defined by ERISA) to the Plan." *Id*.  Specifically, "[a]s of December 31, 2020 and 2019, funds of $902,492,644 and $852,525,799, respectively, were held in such investments and are considered party-in-interest transactions."  *Id*.

31.     **Plan assets**.  The Plan had total assets valued at approximately $1.9 billion and $2.2 billion as of December 31, 2019 and December 31, 2020, respectively.  *See* Exhibit A at 5.

## IV.     DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES BY FAILING TO ESTABLISH AND FOLLOW A PRUDENT AND LOYAL PROCESS FOR MONITORING PLAN FUNDS AND ADMINISTRATIVE FEES

32.     Pursuant to ERISA, plan fiduciaries such as Defendants, must: (i) discharge their plan-related duties for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of plan administration; (ii) act with the care, skill, prudence, and diligence

under the circumstances then prevailing, that a prudent person acting in like capacity and experienced with such matters would use under the circumstances; (iii) diversify plan investments; and (iv) act in accordance with the terms of the plan, insofar as those terms comply with the statute. ERISA §404, 29 U.S.C.§1104.  Notably, ERISA fiduciaries are under a continuing duty to monitor plan investments.  *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.").

33.     According to regulatory guidance issued by the U.S. Department of Labor ("DOL"), procedural due diligence undertaken by plan fiduciaries is meant to ensure that plan-related investment decisions are reasonable and in furtherance of the retirement plan's purpose:

> Appropriate consideration shall include, but is not limited to (a) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.

29 C.F.R. §2550.404a-1.

34.     In order to fulfill their ERISA duties and advance the purposes of the plan under their watch, fiduciaries, such as Defendants, should scrutinize each plan investment on a regular basis with appropriate consideration for, *inter alia*, the risk of loss, current and projected returns, diversification, as well as the costs associated with that investment.  Such careful monitoring is especially important, where, as here, the retirement investments at issue include a QDIA, to which the participants' savings are automatically allocated, unless specifically chosen otherwise, by virtue of these investments' default designation.

35.     Fiduciaries should also consider the size and bargaining power of a given plan in the course of their process of investment selection and monitoring.  Here, the Plan, with over two

billion dollars in assets, is one of the largest defined contribution plans in the nation. As such, throughout the Relevant Period, the Plan had tremendous bargaining power to obtain superior investments with outstanding performance results at low costs. Likewise, the Plan could have obtained superior and unconflicted administrative services for the Plan, including recordkeeping services. In particular, at all relevant times, there have been many non-Voya-branded, reasonably priced and well-managed retirement investment options in the 401(k) plan marketplace available to the Plan with proven performance track records. Such options include registered mutual funds, exchange-traded funds, and non-registered commingled funds such as bank collective or common trusts and insurance company pooled separate accounts. Similarly, numerous third-party vendors could have provided administrative services to the Plan during the Relevant Period that would not have been subject to conflicts of interest vis-à-vis the Plan.

36. Yet, in derogation of their ERISA-mandated duties, Defendants failed to consider the continued prudence of maintaining the Voya Funds and certain other deficient funds in the Plan during the Relevant Period. Defendants' failure is all the more egregious in light of the availability of other non-affiliated investment alternatives with the same investment objectives, that were less risky, less costly, and/or able to present a consistently superior performance record at all relevant times.

37. Here, Defendants did not consider or act in the best interests of the Plan throughout the Relevant Period. Instead, Defendants put their own interests before those of the participants by maintaining the Plan's holdings in a number of deficient funds, including the Voya Funds, to generate fees and otherwise promote and develop Voya's corporate interests to the detriment of the Plan.

38.     While an ERISA fiduciary's use of proprietary investment options in its employee 401(k) plan is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's process for selecting and monitoring proprietary investments *is* subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments.[3]

39.     Here as discussed below, the Plan has an investment lineup featuring a number of underperforming investments, including a large suite of target date funds managed by Voya.  As set forth below, the relevant investment performance and fee data pertaining to the funds challenged herein, including the Voya Funds, support a strong inference that Defendants failed to follow a prudent process in selecting and then monitoring the menu of investment options for Plaintiffs and other participants who invested in the Plan.  Contrary to their fiduciary duties to act in the Plan participants' best interests, Defendants' selection and retention of Voya's proprietary funds as Plan investment options during the Relevant Period (despite these funds' poor performance and other deficiencies alleged herein, as well as the availability of superior unaffiliated investments) indicates that the Defendants' decision-making was tainted by the self-serving purpose of promoting and supporting the Company's own funds and generating self-serving revenue and profits from these funds, regardless of the detrimental impact of that investment strategy on the employees' retirement savings.

---

[3]     *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (denying motion to dismiss in a similar ERISA case and noting that "[i]n total, ***the long-term retention of a substantial number of underperforming funds… gives rise to a plausible inference of an objectively imprudent monitoring process***" by the defendant plan fiduciaries) (emphasis added).  *See also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 912 (W.D. Mo. 2017) (denying dismissal and observing that "[e]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty through improper decision-making, a claim can survive a motion to dismiss if the court may reasonably infer from what was alleged that the fiduciaries followed a flawed process").

40.     Additionally, Defendants imprudently permitted the Plan to be invested in several other deficient options that were kept in the Plan during the Relevant Period, without having been vetted via a proper fiduciary process that would take into account such factors as lack of relevant performance histories or a history of chronic underperformance.   The absence of a proper monitoring process during the Relevant Period resulted in multi-million dollar damages to the Plan and its participants.

**A.     Defendants Imprudently Maintained the Plan's Investment in the Voya Stable Value Option, When Other Investment Vendors Offered Superior Alternatives**

41.     During the Relevant Period, Defendants caused the Plan to offer the Voya Stable Value Option by having the Plan enter into a group annuity contract with Defendant VRIAC,[4] a Voya subsidiary, which among other things serves as the Plan's recordkeeper and is acknowledged to be "a party-in-interest" within the meaning of ERISA in Plan filings.[5]   The contract issued by VRIAC ("Contract"), which is the underlying investment of the Voya Stable Value Option, is owned by the Plan.[6]   As of December 31, 2020 and 2019, the contract value of the investments in insurance contracts was $488,323,353 and $438,401,493, respectively.   *See* Exhibit A at 16.[7]

---

[4]      *See* the fact sheet for Voya Stable Value Option, dated October 2021 ("Voya Stable Value Option Fact Sheet") attached as Exhibit B hereto.

[5]      Exhibit A (2020 Form 11-K) at 16.

[6]      "Subject to certain conditions, the contract generally guarantees the availability of participant account balances."  Exhibit B (Voya Stable Value Option Fact Sheet).

[7]      According to the 2020 Form 11-K, certain events can limit the ability of the Plan to transact at contract value with VRIAC.  "Such events include the following: (i) amendments to the Plan documents . . . (ii) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions; or (iii) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA."  Exhibit A at 16.

42.     The Voya Stable Value Option is a separate account that is managed by Defendant Voya Investment Management, which, as noted above, is another wholly-owned subsidiary of Voya.  *See* Exhibit B.

43.     Plaintiffs Smith, Shur, Ravarino, and Bollinger are invested in the Voya Stable Value Option through the Plan.

44.     Under the Contract, VRIAC takes the assets that Plan participants have directed to be invested in the Voya Stable Value Option (the "principal amount") and deposits them in Voya's so-called "general account," where VRIAC puts those assets to work earning investment returns for the Voya family of companies.  *See* VRIAC's General Account Portfolio Update, as of June 30, 2021, attached hereto as Exhibit C.  While the assets of the Voya Stable Value Option are legally "'insulated' from claims arising of any other business conducted by VRIAC" (Exhibit B), Voya earns investment income from the investment of contract deposits, such as those of the Voya Stable Value Option here, in the Company's general account portfolio.

45.     Voya's financial outlook at any given time turns in large part on investment income from Voya's general account.  When Voya's general account investments do well, broadly speaking, Defendants here likewise do well.  As concerns the guaranteed retirement account products (including the Voya Stable Value Option) that Voya markets to retirement investors like Plaintiffs, Voya's profitability turns on the difference between the investment income Voya earns through its general account investing and the so-called "crediting rates" that Voya pays out on client accounts like the Voya Stable Value Option accounts that Plaintiffs Smith, Shur, Ravarino, and Bollinger maintain.

46. According to the 2020 Form 11-K, the earnings of the Voya Stable Value Option "are based on an interest rate applied to each participant's outstanding balance." Exhibit A at 16.[8] Further, the interest rates can be reset by VRIAC on a semi-annual basis. *Id*.[9]

47. As such, at least every six months, VRIAC putatively selects a certain "crediting rate" for the Voya Stable Value Option, which VRIAC then applies to the Voya Stable Value Option's asset base for the next six months in calculating its rate of return. *See, e.g.*, Exhibit A at 16. ("Crediting rate" in this context simply means the rate of investment return.) VRIAC can set the Voya Stable Value Option's crediting rate as low as zero percent (0%) if it so chooses. *See, e.g.*, Exhibit D at 7.

48. The actual earnings of the general account in which most of Voya's corporate assets are parked consistently and vastly exceed the crediting rate investment returns that VRIAC credits to Plaintiffs Smith, Shur, Ravarino, and Bollinger and other Plan participants invested in the Voya Stable Value Option.

---

[8] Notably, the Plan's Form 5500 and Form 11-K filings with the DOL and the SEC, respectively, during the Relevant Period provide that there is no guaranteed minimum interest rate associated with the Voya Stable Value Option. For instance, the 2020 Form 11-K notes "the Contract has no minimum crediting interest rate . . . ." Exhibit A at 16. However, according to the Plan's 2021 participant disclosure notice, dated June 30, 2021 ("2021 Participant Disclosure Notice"), attached hereto as Exhibit D, "[r]ates are . . . never to fall below the guaranteed minimum interest rate of 0.00%." *Id*. at 7. Furthermore, Voya Stable Value Option Fact Sheet provides that "[w]hile the contract is active, Stabilizer℠ guarantees a minimum rate of interest . . . ." (Stabilizer℠ is the "separate account group annuity contract provided by VRIAC.") Exhibit B. As such, had a prudent fiduciary process been in place, the Plan Form 5500 and Form 11-K filings would not have contained this inconsistent information pertaining to the crediting rate associated with the Voya Stable Value Option, thereby misleading the public and Plan participants with regard to the risks of investing in the Voya Stable Value Option.

[9] The Plan's 2021 Participant Disclosure Notice provides that the relevant rates "are reviewed 4 times a year and are subject to change at that time . . ." (as opposed to semi-annually as reported in the Plan's Form 11-K filings). Exhibit D at 7. This is yet another discrepancy between the various Plan-related documents with regard to the Voya Stable Value Option that has gone uncorrected by Defendants here due to lack of a proper process.

49.     During the Relevant Period, Voya kept the difference between the investment returns generated by its general account and the crediting rate returns that VRIAC credited to Plaintiffs Smith, Shur, Ravarino, and Bollinger and other Plan participants in violation of ERISA.

50.     In retirement investment industry-speak, the difference between Voya's general account investment returns and the rate that VRIAC credits to retirement investors in the Voya Stable Value Option (like Plaintiffs Smith, Shur, Ravarino, and Bollinger here) is called the "spread."

51.     From the spread, VRIAC not only reimburses its own costs for providing the Voya Stable Value Option, but it also charges investment and administrative fees and makes a significant profit thereby for itself and its corporate parent, Voya.

52.     The Contract effectively enables VRIAC to determine how much interest it will credit, thus giving VRIAC (or VRIAC together with Voya) complete control over how much of the investment yield from the Voya Stable Value Option would inure to the benefit of Plan investors and how much VRIAC would keep for Voya's own benefit.

53.     In short, during the Relevant Period, VRIAC has used its discretionary control over the crediting rate of the Voya Stable Value Option to increase Voya's general account profits rather than pay Plaintiffs Smith, Shur, Ravarino, and Bollinger, as well as the other Plan participants increased retirement investing returns.

54.     Accordingly, VRIAC (on behalf of its corporate parent Voya) engaged in self-dealing against Plaintiffs Smith, Shur, Ravarino, and Bollinger and the other Plan participants by setting the crediting rate for the Voya Stable Value Option to pay Voya more (in retained percentage of the "spread" on the Plan participants' investments in the Voya Stable Value Option),

while paying Plan participants less (viz, a lower crediting rate on Plan participants' investments in the Voya Stable Value Option rather than a higher one).

55.     Voya does not disclose the exact amount of the spread earnings that it has made here off the backs of Plaintiffs or the return on the underlying General Account assets that back the Voya Stable Value Option.  However, publicly available information indicates that not only has the spread involved here existed continuously during the Relevant Period, but that the amount of the spread has also been considerable – meaning that Voya has kept significantly more of the investment returns yielded by the Voya Stable Value Option than Voya has paid to Plan participants invested in this fund.

56.     To wit, Voya publishes its general account returns for the Fourth Quarter yearly in its annual report.  During the Relevant Period, the Fourth Quarter general account returns have been reported as follows:

| Year | Voya General Account Return |
|------|------------------------------|
| 2021 | 6.1% |
| 2020 | 4.7% |
| 2019 | 5.3% |
| 2018 | 5.2% |
| 2017 | 5.2% |
| 2016 | 5.1% |
| 2015 | 5.0% |

57.     As shown by the chart below, for each year of the Relevant Period, Voya's general account investment returns have substantially exceeded the crediting rate that VRIAC paid to Plaintiffs and the other Plan participants through the Voya Stable Value Option.

| Plan Year | Plan's Stable Value Option Assets | Participant Crediting Rate | Voya General Account Earnings | Crediting Rate Difference | Dollar Difference |
|---|---|---|---|---|---|
| 2015 | $400,906,871 | 2.82% | 5.00% | 2.18% | $8,739,770 |
| 2016 | $422,361,672 | 2.49% | 5.10% | 2.61% | $11,023,640 |
| 2017 | $424,365,656 | 2.37% | 5.20% | 2.83% | $12,009,548 |
| 2018 | $427,345,379 | 2.33% | 5.20% | 2.87% | $12,264,812 |
| 2019 | $438,401,493 | 2.57% | 5.30% | 2.73% | $11,968,361 |
| 2020 | $488,323,353 | 2.32% | 4.70% | 2.38% | $11,622,096 |
| **Total** | | | | | $67,628,226 |

58.     As such, during the Relevant Period, VRIAC has consistently enjoyed over 2.0% (or 200 basis points, stated differently) in spread profits via the Voya Stable Value Option owned by Plaintiffs and other Plan participants through the Plan – which, again, came at the direct expense of Plaintiffs and the proposed Class here at a time when VRIAC was an ERISA fiduciary to the Plan.  In dollar amounts, as shown by the chart above, the spread profits retained by VRIAC here exceed $67 million during the Relevant Period (not even taking into account the 2021 Plan year for which all of the relevant Plan information is not yet available).

59.     Moreover, the spread retained by VRIAC here vastly exceeds any bona fide costs Defendants have incurred in managing and offering the Voya Stable Value Option.

60.     Furthermore, because VRIAC is a wholly-owned subsidiary of Voya, that profit ultimately inures to the benefit of Voya and all of its family of portfolio companies.

61.     Because the Plan is a defined contribution plan, the profits retained by VRIAC and Voya here directly reduce the benefits Plan participants such as Plaintiffs Smith, Shur, Ravarino, and Bollinger are entitled to receive at retirement.

62.     Moreover, there are numerous capital preservation retirement investment options besides the Voya Stable Value Option available from other investment providers with higher crediting rates (that is, that pay more to retirement plan participant investors) and lower fees.

63.     Indeed, during the Relevant Period, the average returns of comparable capital preservation retirement plan investment products were much higher than the crediting rate for the Voya Stable Value Option, according to the Stable Value Investment Association ("SVIA"):

| Year | Voya Stable Value Option Crediting Rate[10] | SVIA |
|------|------------------------------------|------|
| 2021 | 1.88% | |
| 2020 | 2.32% | 2.59% |
| 2019 | 2.57% | 3.0% |
| 2018 | 2.33% | 2.5% |
| 2017 | 2.37% | 2.76% |
| 2016 | 2.49% | 2.5% |
| 2015 | 2.82% | 2.9% |
| 2014 | 2.49% | 4.56% |
| 2013 | 2.65% | 3.00% |

64.     Therefore, Defendants could have invested the Plan in one or more of the products included in the SVIA average in lieu of the Voya Stable Value Option.

65.     For instance, instead of the Voya Stable Value Option, Defendants could have instead offered alternative products such as the Putnam Stable Value Fund and the Jennison Stable Value Fund, whose performance compared to the Voya Stable Value Option is as follows:

| As of 9/30/2021 | Voya Stable Value Option 28bps | Putnam Stable Value Fund 25bps | Jennison Stable Value Fund 27bps |
|-----------------|-------------------------------|--------------------------------|----------------------------------|
| 5 Year | 2.31 | 2.49 | 2.80 |
| 3 Year | 2.27 | 2.64 | 2.8 |

---

[10]     Form 11-K Plan filings with the SEC for 2013-2021 Plan years, available at https://www.sec.gov/edgar/browse/?CIK=1535929&owner=exclude.

| 1 Year | 1.88 | 2.55 | 2.5 |
|--------|------|------|-----|

66.     Defendants also improperly profited from the expenses associated with investing in the Voya Stable Value Option to the Plan participants' detriment.   Voya Investment Management, which manages the Voya Stable Value Option, charges 28 bps (or .28%) of Plan assets to manage this fund.   During the Relevant Period, Defendants have earned over $7.28 Million off the fund expense alone.   Both the Putnam Stable Value Fund and the Jennison Stable Value Fund in the above chart have not only outperformed the Voya Stable Value Option during the Relevant Period, but they were also less expensive in terms of the associated fees.   Defendants were well aware of the instant zero-sum-game-type conflict of interest that exists as between Voya and its subsidiaries on the one hand and the Plan participants on the other when Defendants chose to include the Voya Stable Value Option as an investment option in the Plan instead of a superior capital preservation investment option.   But Defendants included it in the Plan, even so, because the "spread" feature of the Voya Stable Value Option enabled Voya to pay itself more while paying Plaintiffs and the other Plan participants less – and Voya did so during the entirety of the Relevant Period in violation of ERISA.

67.     Defendants had numerous opportunities during the Relevant Period to remove the Voya Stable Value Option from the Plan and replace it with a lower cost and better performing option from another provider.   Defendants, however, chose to offer the Voya Stable Value Option anyway in order to create profits for Voya, VRIAC, and Voya Investment Management here, which greatly exceeded any expenses that Defendants actually incurred from offering the Voya Stable Value Option in the Plan.

68.     Defendants concealed their self-dealing concerning the Voya Stable Value Option from Plan participants and never disclosed that they were greatly profiting from the inclusion of the Voya Stable Value Option in the Plan.

69.     No Defendant disclosed to Plaintiffs and the proposed Class either (i) the amount or existence of the spread retained by VRIAC and Voya with respect to the Voya Stable Value Option or (ii) the substantial and unjustified mark-ups to the expense of investing in the other available investment alternatives.

**B.      Defendants Imprudently Maintained the Plan's Investment in Deficient Proprietary Target Date Funds, When Other Investment Vendors Offered Superior Options**

**1.      The Plan's Target Date Funds**

70.     The Plan offers a suite of so-called target date funds or "TDFs" to retirement investors who work for Voya, including Plaintiffs.  Target date funds are designed to provide a model asset allocation based on a given investor's projected retirement date, *i.e.*, the target date, and generally rebalance their portfolios to become more conservative as the investor nears retirement.  Target date funds are an eligible qualified default investment alternative (defined as "QDIA" *supra*) under the Pension Protection Act of 2006.

71.     Here, the Plan's TDF strategy consists of Voya's proprietary target date fund series called the Voya Target Index Solution Trusts ("Voya Target Trusts"),[11] with the funds' respective

---

[11]     These funds are organized as a collective investment trust (as opposed to a registered investment company or mutual fund).  Collective investment trusts are subject to either state or federal banking regulations but are exempt from regulation by the SEC and the securities regulations of any state or other jurisdiction.  Accordingly, public information is not as readily available for collective investment trusts as it would be for mutual funds.  For information to support the allegations in the Complaint, Plaintiffs have relied primarily on the Plan's DOL and SEC filings and data published by Morningstar.

target retirement dates ranging from 2020 to 2065.[12]  Defendant Voya Investment Trust serves as the investment adviser for the Voya Target Trusts.

72.     Throughout the Relevant Period, the Voya Target Trusts have been the only target date retirement investment options in the Plan.  As such, Plan participants who want to invest in a tax-advantaged target date fund strategy have no choices other than the Voya Target Trusts.[13]

73.     As noted above, the Voya Target Trusts are also designated here as the Plan's QDIA.  That is, if participants do not make investment fund elections, the Plan automatically invests their contributions, along with any matching contributions and/or earnings, in one of the Voya Target Trusts based on the year they turn 65.

## 2.     Defendants Failed to Adhere to a Prudent Fiduciary Process with Regard to the Plan's Target Date Funds

74.     The use of target date funds as 401(k) investment options by defined contribution plans, such as the Plan, has grown exponentially over the last decade, in large part due to the automatic enrollment of newly eligible plan participants in these funds.  By the end of 2020, "95% of plans offered a TDF, 80% of all participants had a position in one, and the funds accounted for 37% of plans' assets and 60% of total plan contributions."[14]

75.     Because of the prevalent use of target date funds by retirement plans in the United States, the TDF market is highly competitive and lucrative, with many target date fund providers vying to procure such business, especially with regard to jumbo plans like the Plan.  According to

---

[12]     Additionally, Voya TDFs include a fund called the Voya Target Index Solution Trust Income.

[13]     Voya offers certain other proprietary target date fund strategies to its non-Plan investors, but those strategies are not available to Plan participants.

[14]     *Target-date fund adoption in 2020*, Vanguard Research Note (March 2021), https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvResTDFAdoption2020.

Vanguard, one of the industry's leaders,[15] "[i]n the past 10 years through 2020, assets [held by TDFs] grew from $290 billion to $2.6 trillion as TDFs gained significant traction as a [QDIA]."[16] As such, retirement plan fiduciaries have numerous target date funds to choose from when selecting target date fund options for the plans under their watch.

76.     Given the popularity of target date funds with 401(k) plan participants (especially as here, where these funds are offered as the Plan's default investments), and further given the broad array of TDFs available in the marketplace, having a prudent and unconflicted process in place for monitoring a retirement plan's TDF strategy is of utmost importance while serving as a 401(k) plan fiduciary.

77.     As Vanguard advises employers with regard to defined contribution plan investing, "[w]ith TDFs playing such an important role in employees' retirement, selecting the right one is one of the most important decisions you can make for your lineup."[17]  Such a process entails (among other things) periodic target date fund reviews that include consideration of alternative strategies to ensure the TDF solutions offered through the plan remain prudent.  In instances, where as here, a target date fund strategy is designated as a retirement plan's default investment, comprehensive QDIA due diligence is especially important to ensure the prudence of that investment for the plan at issue.[18]

---

[15]     Per the Morningstar Target Date Landscape whitepaper, 37% of plans had Vanguard Target Date Retirement Funds in their defined contribution plan.

[16]     Colleen M. Jaconetti, Kimberly A. Stockton, Christos Tasopoulos, and Vivien Chen, *TDF strategies for retirement income*, The Vanguard Group (September 2021), https://institutional. vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComLineUpRetireGo als.

[17]     *Defined contribution investing*, https://institutional.vanguard.com/solutions/dcinvesting/ investmentstrategies.

[18]     By way of example, Vanguard advises its prospective institutional clients that "[y]ou also have a duty as a fiduciary to establish a regular due diligence process to protect your plan

78.     Yet here no such prudent process was followed by Defendants.  Despite the Plan's jumbo size, which should have enabled Defendants to obtain superior target date funds to offer to Plan participants, and despite a market flush with such better-performing alternatives available to the Plan, Defendants imprudently kept the Plan invested in the Voya Target Trusts throughout the Relevant Period.  All the while these funds underperformed comparable target date funds offered by competing fund families.

79.     Indeed for almost a decade (since Voya launched them beginning in 2012), the Voya Target Trusts have performed worse than [25%] to [45%] of peer funds.  The Plan assets placed in these poorly performing funds constituted between 11.1% and 15.6 % of total Plan assets during the Relevant Period, thereby significantly diminishing the value of the participants' retirement savings.  Yet Defendants persistently failed to conduct appropriate due diligence concerning the inclusion of the Voya Target Trusts in the Plan, including failing to consider and examine properly the available alternative investments.  And Defendants likewise took no measures to protect the Plan participants from losses stemming from the Plan investment in Voya Target Trusts.

80.     The Voya Target Trusts should not have been offered as investment options in a plan of the Plan's size.  Notably, the Voya Target Trusts offered through the Plan are not utilized in any other non-Voya retirement plan in the United States.  Further, the performance of the Voya Target Trusts is significantly lacking when compared to such standard target date investments as the Vanguard Target Retirement Trusts.  As shown below, the institutional share class of the Vanguard Target Retirement Trusts suite, the most widely utilized target date offering,

participants," and offers its institutional investment advisory services to, *inter alia*, "help [companies] make sense of defined contribution investment concerns such as suitability of custom portfolios and detailed QDIA due diligence," https://institutional.vanguard.com/solutions/dcadvisory-services (last visited Dec. 13, 2021).

substantially outperforms the Voya Target Trusts on a trailing one-year, three-year and five-year basis, virtually across the board.

| As of June 30, 2021 | | | | |
| --- | --- | --- | --- | --- |
| Fund Name | Expense Ratio | 1 year | 3 year | 5 year |
| **VANGUARD** | | | | |
| Vanguard Target Retirement 2025 Trust I | 0.065% | 22.81% | 11.20% | 10.65% |
| Vanguard Target Retirement 2030 Trust I | 0.065% | 26.03% | 11.96% | 11.57% |
| Vanguard Target Retirement 2035 Trust I | 0.065% | 29.38% | 12.70% | 12.49% |
| Vanguard Target Retirement 2040 Trust I | 0.065% | 32.71% | 13.40% | 13.38% |
| Vanguard Target Retirement 2045 Trust I | 0.065% | 36.13% | 14.12% | 13.99% |
| Vanguard Target Retirement 2050 Trust I | 0.065% | 36.47% | 14.23% | 14.06% |
| Vanguard Target Retirement 2055 Trust I | 0.065% | 36.48% | 14.23% | 14.05% |
| Vanguard Target Retirement 2060 Trust I | 0.065% | 36.49% | 14.26% | 14.08% |
| Vanguard Target Retirement 2065 Trust I | 0.065% | 36.49% | 14.29% | |
| Vanguard Target Retirement Income Trust I | 0.065% | 12.01% | 8.10% | 6.70% |
| | | | | |
| **VOYA** | | | | |
| VOYA Target Index Solution TR 2025 CI 3 | 0.05% | 16.01% | 10.17% | 9.32% |
| VOYA Target Index Solution TR 2030 CI 3 | 0.05% | 23.17% | 11.65% | 11.37% |
| VOYA Target Index Solution TR 2035 CI 3 | 0.05% | 29.38% | 12.93% | 12.93% |
| VOYA Target Index Solution TR 2040 CI 3 | 0.05% | 33.18% | 13.72% | 13.70% |
| VOYA Target Index Solution TR 2045 CI 3 | 0.05% | 34.06% | 13.88% | 13.82% |
| VOYA Target Index Solution TR 2050 CI 3 | 0.05% | 34.05% | 13.88% | 13.82% |
| VOYA Target Index Solution TR 2055 CI 3 | 0.05% | 34.06% | 13.87% | 13.82% |
| VOYA Target Index Solution TR 2060 CI 3 | 0.05% | 34.05% | 13.88% | 13.82% |
| VOYA Target Index Solution TR 2065 CI 3 | 0.05% | new | fund | |

81.     The Voya Target Trusts' lack of usage in the industry alone highlights the imprudence of selecting and retaining them as investment options for the Plan.  Since inception, the only investors in the Voya Target Trusts have been three Voya-sponsored plans, including the Plan itself.  Namely, in 2013, the following three Voya plans were invested in the Voya Target Trusts: (1) the Plan, (2) the Voya 401k Savings Plan for VRIAC Agents, and (3) the Voya Equifund Retirement plan.  Currently, the only remaining investor in Voya Target Trusts is the Plan.  In other words, Voya Target Trusts are not used by any other retirement plan in the nation, or the investing community at large.

82.     As noted, *supra*, Voya offers certain other proprietary target date fund strategies to its non-Plan investors, but those strategies are not included in the Plan.  As such, here, Plan participants' target date fund investment choices are limited solely to the Voya Target Trusts,

which, besides underperforming the alternatives offered by other target date fund providers, also underperformed Voya's own target date funds offered to other investors.

83.    For example, during the Relevant Period, a proprietary Voya target date fund strategy called Voya Target Retirement Funds Class R6 has outperformed the Voya Target Trusts (offered through the Plan) net of fees from the funds' respective inception dates through September 30, 2021:

| As of 9/03/2021 | | |
| --- | --- | --- |
| Voya 401(k) Savings Plan | Return Since Inception | Inception Date |
| VOYA Target Index Solution TR 2025 CI 3 | 8.41% | 11/15/2012 |
| VOYA Target Index Solution TR 2030 CI 3 | 8.50% | 3/21/2014 |
| VOYA Target Index Solution TR 2035 CI 3 | 10.92% | 11/15/2021 |
| VOYA Target Index Solution TR 2040 CI 3 | 9.95% | 3/21/2014 |
| VOYA Target Index Solution TR 2045 CI 3 | 11.77% | 11/15/2012 |
| VOYA Target Index Solution TR 2050 CI 3 | 10.03% | 3/21/2014 |
| VOYA Target Index Solution TR 2055 CI 3 | 11.77% | 11/15/2012 |
| VOYA Target Index Solution TR 2060 CI 3 | 11.34% | 8/17/2015 |
| VOYA Target Index Solution TR 2065 CI 3 | 25.00% | 8/2/2020 |
| VOYA Target Index Solution Income Trust | 6.35% | 11/15/2012 |
| | | |
| Other Voya Option | Return Since Inception | Inception Date |
| Voya Target Retirement 2025 R6 | 9.27% | 12/21/2015 |
| Voya Target Retirement 2030 R6 | 10.26% | 12/21/2015 |
| Voya Target Retirement 2035 R6 | 11.14% | 12/21/2015 |
| Voya Target Retirement 2040 R6 | 11.90% | 12/21/2015 |
| Voya Target Retirement 2045 R6 | 12.24% | 12/21/2015 |
| Voya Target Retirement 2050 R6 | 12.20% | 12/21/2015 |
| Voya Target Retirement 2055 R6 | 12.30% | 12/21/2015 |
| Voya Target Retirement 2060 R6 | 12.34% | 12/21/2015 |
| Voya Target Retirement 2065 R6 | 26.10% | 7/29/2020 |
| Voya Target In-Retirement R6 | 6.67% | 12/21/2015 |

84.    As such, during the Relevant Period, Defendants failed to offer to Plaintiffs and the proposed Class here Voya's own alternative target date fund series that Voya offered to other (non-Plan) investors and that performed better than the Voya Target Trusts included in the Plan.  In

other words, Voya put its employees in a target date fund strategy that persistently fared worse than its other target date funds that were provided to non-Plan investors during the Relevant Period (not to mention the numerous alternative target date fund solutions available to the Plan from other un-affiliated providers).

85.     As of December 31, 2019, a little over $300 million, or over 15.6% of Plan assets, were invested in the poorly performing Voya Target Trusts.  Entrusting a significant portion of the Plan assets (despite the Plan's considerable market power), to a such a small player in the target date fund market, which also happens to be Plaintiffs' employer (Voya), and further placing those assets into a target date fund strategy that is not used by any other retirement plan in the country, indicates that the selection and retention of the Voya Target Trusts for the Plan was not the result of Defendants following a prudent process of selecting and monitoring investment options for the Plan.  To the contrary, maintaining the Voya Target Trusts in the Plan throughout the Relevant Period despite their persistently poor performance and in further disregard of the ready availability of superior alternatives raises a plausible inference that Defendants' fund selection and monitoring process for the Plan was tainted by a failure of competency or effort, and that no viable Plan investment policy was in place.  A reasonable investigation by Defendants would have revealed these funds' chronic underperformance and prompted Defendants to remove and replace them with prudent options.

### C.     Defendants Imprudently Selected for the Plan and Maintained the Plan's Investment in the Voya Small Cap Growth Trust Fund, When Other Investment Vendors Offered Superior Alternatives

86.     In addition to maintaining imprudently the Plan's investments in Voya's Stable Value Option and Voya Target Trusts, Defendants also failed to conduct appropriate due diligence when they added another proprietary Voya investment, the Voya Small Cap Growth Trust Fund,

as a Plan offering and kept that underperforming fund in the Plan during the Relevant Period until 2020, when it was belatedly removed from the Plan's investment lineup.

87.    When placing a new fund in a retirement plan, any prudent fiduciary adhering to a rigorous process would have compared this fund's performance with the performance of established investment options with the same strategy.  Here, Defendants failed to follow a prudent process and in 2017, put the Plan into the then-poorly performing Voya Small Cap Growth Trust Fund, which has not met or outperformed the Russell 2000 Growth Index (its benchmark) since the fund's inception in 2012.  To demonstrate Defendants' failure to select and then retain the Voya Small Cap Growth Trust Fund with prudence and loyalty, below is a performance chart covering the three-year and five-year performance history and tracking error of the Voya Small Cap Growth Trust Fund Cl 2 as of June 30, 2021:

| | Fee | 3 year | 5 year |
|---|---|---|---|
| **VOYA Small Cap Growth Trust Fund Cl 2** | 0.05% | 11.34% | 14.72% |
| Benchmark-Russell 2000 Growth Index | | 15.94% | 18.76% |
| Tracking Error | | 4.43 | 3.78 |
| Vanguard Small-cap Growth Index Fund Admiral | 0.07% | 15.06% | 17.09% |
| Tracking Error | | .03 | .03 |
| Vanguard Small-cap Growth Index Fund ETF | 0.07% | 15.14% | 16.37% |
| Tracking Error | | .03 | .02 |

88.    This chart shows that Voya Small Cap Growth Trust Fund significantly underperformed the Voya provided benchmark and other small cap growth competitors in the marketplace.  The chart also shows Voya had the highest tracking error over the same respective periods.  In fact, the Voya Small Cap Growth Trust Fund was so deficient, that in 2019 almost 100 non-Plan investors exited this investment.

89.    Had Defendants performed a reasonable investigation of marketplace alternatives before adding the Voya Small Cap Growth Trust Fund to the Plan, and then continued to monitor

its performance during the Relevant Period, consistent with the practice of other plan fiduciaries, they would have come across ample evidence that the Voya Small Cap Growth Trust Fund should not have been added to the Plan in the first place, and that it subsequently should have been removed well prior to 2020 and/or been replaced with one of the more competitive alternatives in the marketplace (such as those listed above), all of which were available to Defendants in the share class listed.

### D.   Defendants Imprudently Maintained the Plan's Investment in the Voya Real Estate Fund, When Other Investment Vendors Offered Superior Alternatives

90.     Defendants also imprudently maintained the Plan's investment in the Voya Real Estate Fund during the Relevant Period.  The Voya Real Estate Fund has not outperformed its Voya-provided benchmark of the MSCI US REIT Index during the Relevant Period up to 2019, when it was belatedly removed from the Plan.

91.     While the Voya Real Estate Fund remained in the Plan during the Relevant Period, not only did it underperform its benchmark, but Defendants also improperly profited from the expenses associated with this fund to the detriment of the Plan.  In particular, Plan participants were charged 92 bps (or .92%) of Plan assets invested in this fund by Voya to manage this fund. During the Relevant Period, Defendants earned over $2.0 Million off this fund expense alone.  By contrast, for example, the Fidelity Real Estate Index Fund Institutional (FSRNX) only charged seven bps (or .07%) during the Relevant Period, and has outperformed its one, three, and five year benchmarks.

### E.   Defendants Imprudently Maintained the Plan's Investment in the Cohen and Steers Real Asset Multi-Strategy Fund, When Other Investment Vendors Offered Superior Alternatives

92.     In addition to the above-discussed deficient proprietary funds, Defendants also imprudently maintained the Plan's investment in the Cohen and Steers Real Asset Multi-Strategy

Collective Investment Trust ("C&S Fund") during the Relevant Period. As shown in the chart below, this fund underperformed its peers and the Voya provided benchmarks in the one, three and five-year return periods, respectively.

| As of June 30, 2021 | 1-Year | 3-Year | 5-Year |
|---|---|---|---|
| **Cohen & Steers Real Asset Multi Strategy Collective Investment Trust** | 31.95% | 8.37% | 6.05% |
| **Vanguard Total World Stock Index Fund Institutional (VTWIX)** | 34.53% | 13.74% | 13.99% |
| **DFA Global Equity Portfolio Class R2 (DGERX)** | 33.69% | 12.41% | 13.02% |
| **Benchmark MSCI World Index** | 34.64% | 13.79% | 14.02% |

93.     The C&S Fund was further imprudent for the Plan during the Relevant Period because it charged unreasonably high investment management fees. In contrast, other better performing alternatives, such as the ones listed below, were available for a fraction of this fund's costs.

| **Cohen & Steers Real Asset Multi Strategy Collective Investment Trust** | 70 bps (or 0.70%) |
|---|---|
| **Vanguard Total World Stock Index Fund Institutional (VTWIX)** | 8 bps (or 0.08%) |
| **DFA Global Equity Portfolio Class R2 (DGERX)** | 50 bps (or 0.50%) |

94.     A prudent fiduciary would not have kept the C&S Fund in the Plan given its poor performance history and unreasonably high expenses, especially when superior alternatives were available at a lesser cost.

   **F.     Defendants Imprudently Maintained the Plan's Investment in the Brown Advisory Small-Cap Growth Equity Portfolio, When Other Investment Vendors Offered Superior Alternatives**

95.     Defendants also imprudently selected and retained the Brown Advisory Small-Cap Growth Equity Portfolio ("Brown Advisory Fund") for the Plan during the Relevant Period. Even though the Brown Advisory Fund was only created on December 4, 2020, Defendants proceeded

to add it to the Plan's investment lineup without conducting appropriate due diligence with regard to this fund.   A prudent fiduciary would not have added an untested investment option to a retirement plan, without vetting that fund's 10-year, five-year, or three-year respective performance histories, let alone if, as here, that option lacked any performance history whatsoever.

96.     The Brown Advisory Fund was also imprudent for the Plan during the Relevant Period because it charged unreasonably high investment management fees.   In particular, Plan participants were charged a 62 bps (or 0.62%) investment management fee in connection with this fund.   In contrast, other comparable alternatives, such as the Vanguard Small Cap Growth Index (VISGX) only charged 19 bps (or 0.19%) in fees.

**G.     Defendants Failed to Monitor and Negotiate the Plan's Administrative Costs**

97.     In addition to the fiduciary misconduct discussed above, Defendants also breached their duty to monitor the Plan's administrative costs, including the Plan's recordkeeping expenses, and to ensure that these costs were reasonable and prudent, and not the result of disloyal decision-making.   As the Plan's 2021 Participant Disclosure Notice cautions, "[t]he cumulative effect of fees and expenses can substantially reduce the growth of your retirement savings."   Exhibit D at 9.   Furthermore, the 2020 Form 11-K warns that "[p]articipant accounts may be reduced by any administrative fees or expenses charged against the account."   Exhibit A at 7.   Additionally, as per the 2020 Form 11-K, all expenses of the Plan here are paid by the Plan Trust Fund, unless the Company elects to pay such expenses.   *Id*. at 9.

98.     As such, in keeping with their fiduciary mandate, it was incumbent upon Defendants to closely scrutinize all Plan-related services, with an eye towards cost-conscious Plan management.   Yet, instead of retaining an independent entity to provide administrative services for the Plan, Defendants chose to keep these services in-house at all relevant times, to benefit the

Company through direct or indirect revenue incurred in connection with these services.[19] According to the SPD, Defendant VRIAC, a Voya subsidiary, has served as the Plan recordkeeper throughout the Relevant Period.  Among other things, on information and belief, Defendants failed to conduct an appropriately competitive bidding process during the Relevant Period to the detriment of Plan participants, in order to, *inter alia*, maintain the Plan's administrative services in-house and profit from the direct or indirect fees paid by the participants to the Company, as well as from a host of undisclosed redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options.

99.     "Recordkeeping" is a catchall term for the suite of administrative services typically provided to a 401(k) plan such as the Plan.  The recordkeeping market is highly competitive, with many vendors equally capable of providing recordkeeping services to 401(k) plans.  According to PlanSponsor's 2019 Recordkeeping Survey, 401(k) recordkeepers hold $4.9 trillion of Americans' retirement savings on their platforms.

100.     As such, 401(k) plans can customize the package of administrative services they obtain and have the services priced accordingly, in the best interests of a particular plan and its participants.  According to a study conducted by the Department of Labor, 401(k) plans featuring a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.[20]  Relatedly, as plan asset size increases, the costs per participant should decrease.[21]  Recordkeeping fees for jumbo plans, such as the Plan, have also

---

[19]     Upon information and belief, Voya obtains both direct and indirect revenue through the management and services contracts and all cost-sharing arrangements with the other affiliated Voya entities, such as Defendants VITC and VRIAC.

[20]     *Study of 401k Plan Fees and Expenses*, at 4.2.2 (Apr.13, 1998) (https://www.dol.gov/sites/ dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf).

[21]     *See id*. ("[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

declined significantly in recent years, as a result of, *inter alia*, advances in technology, strong market competition, and increased attention to fees by fiduciaries of other 401(k) plans, such that the fees that may have been reasonable at one time, may have become excessive based on prevailing circumstances.

101.   Accordingly, prudent and unconflicted fiduciaries should put in place and conduct an appropriate process to continuously monitor and control a 401(k) plan's administrative costs. As part of that process, fiduciaries should continuously pay close attention to the administrative fees being paid by the plan.  Among other things, a prudent fiduciary can track the service provider's expenses by seeking documents that summarize and contextualize that provider's compensation, such as the plan's fee transparency reports, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

102.   Additionally, in order to make an informed determination as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, prudent fiduciaries should identify and track all fees, including any direct compensation and revenue sharing being paid to the plan's service providers.  Prudent fiduciaries should further monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels.

103.   Furthermore, in order to fulfill their fiduciary duty to continually monitor administrative expenses to ensure their reasonableness, a plan's fiduciaries should remain informed about the overall trends in the marketplace regarding the fees being paid by other plans, as well as the available rates for administrative services.  This aspect of their fiduciary responsibilities will generally entail conducting a Request for Proposal ("RFP") at reasonable

intervals, or immediately at any given point in time, if the plan's administrative expenses appear high in relation to the general marketplace.[22]

104.    Defendants breached their duty to monitor and control the Plan's administrative costs with prudence and loyalty by failing to undertake any of the aforementioned measures and acting to further the Company's own interests as opposed to those of the Plan.  Here, among other things, there is no indication that Defendants reached out to any independent administrative services providers to conduct a proper bidding process or engaged in appropriate negotiations with such third parties in connection with the Plan's administrative services during the Relevant Period. Additionally, Defendants failed to ensure that the administrative fees paid to the Company's in-house service providers (such as the trustee and the recordkeeper), including through the revenue-sharing arrangements, did not exceed reasonable levels, or unduly profit the Company or other parties in interest.  Likewise, Defendants failed to monitor the appropriateness of the redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options.  As such, the total amount of administrative fees paid in connection with the Plan throughout the Relevant Period was unreasonable and imprudent, and contrary to the Plan's best interests.

105.    Here, as alleged above, the Plan had over 11,000 Participants at the end of the 2020 Plan year, with total assets valued at approximately $2.2 billion as of December 31, 2020.  As such, the Plan is endowed with a significant bargaining power given the numerosity of its participants, as well as its substantial assets.  Yet, Defendants failed to conduct a proper competitive bidding process with independent providers concerning the Plan's recordkeeping

---

[22]    *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (noting opinion of independent consultant in similar case "without an actual fee quote comparison' – *i.e.*, a bid from another service provider – [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided'").

arrangement despite Defendants' ability to negotiate reasonable administrative fees for the Plan, including the recordkeeping fees.

106.    Due to the Plan's strong bargaining power, and the availability of comparable or superior administrative service options in the marketplace, there was no reason for Defendants to forego an appropriate bidding process, thereby significantly reducing the Plan participants' retirement savings.  By way of example, according to *401k Averages Book*,[23] the average recordkeeping/administrative fee through direct compensation, based on data compiled in 2019, was $5 per participant for plans with just 2,000 participants and $200 million in assets (a fraction of the number of participants and assets held by the Plan).  *See id.*, Pension Data Source, Inc. at 107, Chart 24.5 (Range of Per Participant Costs (20th ed. 2020) (data updated through September 30, 2019)).

107.    There is no indication here that the Plan receives any administrative services, including recordkeeping services, beyond those that are typically provided by 401(k) service providers to comparable retirement plans.  Likewise, there is no indication that the value of the administrative services provided to the Plan is any different than the value of such services provided to any other plan of comparable size.  Here, however, the administrative fees, including the recordkeeping fees paid by the Plan during the Relevant Period, were unreasonable and not vetted through a proper bidding process.

108.    On information and belief, the Plan's direct recordkeeping costs were well above the $5 average for plans a fraction of the size of the Plan.  Additionally, participants have incurred further administrative costs in the form of revenue sharing throughout the Relevant Period.  The

---

[23]    According to 401ksource.com, *401k Averages Book*, published since 1995, is the oldest, most recognized source for non-biased, comparative 401(k) average cost information.  It is designed to provide financial services professionals and plan sponsors with essential comparative cost information needed to determine if their plan costs are above or below average.

exact amount of that indirect compensation for recordkeeping services cannot be ascertained based on publicly available information, given that revenue sharing is divided among all the Plan's service providers, which "could include but are not limited to recordkeepers, advisors and platform providers." *401(k) Averages Book* at 7.  Moreover, upon information and belief, throughout the Relevant Period, the Plan's investments have been subject to unspecified redemption fees, commissions, and similar expenses in connection with transactions associated with the Plan's investment options.

109.    Plan participants would have paid much less in recordkeeping and other administrative fees during the Relevant Period were it not for the Defendants' lack of monitoring. Given the size of the Plan's assets during the Relevant Period and the number of its participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained comparable or superior recordkeeping services at a much lower cost.

## V.    DEFENDANTS' BREACHES OF DUTY CAUSED MILLIONS OF DOLLARS IN LOSSES TO THE PLAN AND ITS PARTICIPANTS

110.    The rampant conflicts of interest and breaches of the duty of loyalty described above violate ERISA and mandate disgorgement of fees and other profits received from the Plan, directly or indirectly, by Voya during the Relevant Period, even if the Plan and its participants did not suffer investment losses.  But the Plan and its participants did suffer such losses.  In particular, the Plan has suffered millions of dollars in losses owing to underperformance of its investments or unreasonable fees associated with its investments because Defendants failed to remove or replace the deficient funds challenged herein as Plan investment options.  The Plan suffered further damages resulting from unreasonable administrative fees.  Instead of acting in the best interests of Plan participants, Defendants' conduct and decisions were driven by their desire to drive revenues

and profits to Voya and to generally promote Voya's business interests to the detriment of the Plan.

## VI.   PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND RELATED FACTS UNTIL SHORTLY BEFORE FILING THIS COMPLAINT

106.   Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly sized plans or the availability of superior investment options) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## VII.   ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

107.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  ERISA §404(a), 29 U.S.C.§1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
>> (i)      providing benefits to participants and their beneficiaries; and
>>
>> (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise
of like character and with like aims;

(C)     by diversifying the investments of the plan so as to minimize the risk
of large losses, unless under the circumstances it is clearly prudent
not to do so; and

(D)     in accordance with the documents and instruments governing the
plan insofar as such documents and instruments are consistent with
the provisions of this title and Title IV.

108.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  ERISA §405,

29 U.S.C. §1105, states, in relevant part, that:

In addition to any liability which he may have under any other provision of this
part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
responsibility of another fiduciary with respect to the same plan in the following
circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal,
an act or omission of such other fiduciary, knowing such act or
omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the
administration of his specific responsibilities which give rise to his
status as a fiduciary, he has enabled such other fiduciary to commit
a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he
makes reasonable efforts under the circumstances to remedy the
breach.

109.    Under ERISA, fiduciaries that exercise discretionary authority or control over the

selection of plan investments and the selection of plan service providers must act prudently and

solely in the interest of participants in the plan when selecting investments and retaining service

providers.  Thus, "the duty to conduct an independent investigation into the merits of a particular

investment" is "the most basic of ERISA's investment fiduciary duties."  *In re Unisys Savings*

*Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).  As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the
availability, riskiness, and potential return of alternative investments for his or her

plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DoL Ad. Op. No. 88-16A.

110.    Pursuant to these duties, fiduciaries must ensure that the services provided to the

plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding . . . which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

111.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan

participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives.  Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

112.    The Department of Labor counsels that fiduciaries are responsible for ensuring that

a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences

in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable."   After careful evaluation during the initial

selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.[24]

113.    In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.[25]

---

[24]    *Meeting Your Fiduciary Responsibilities* (May 2004), http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

[25]    *Understanding Retirement Plan Fees and Expenses* (May 2004), https://www.gov/sites/default/ files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

114.    A fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.    ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by plan documents to do so.

115.    ERISA prohibits certain transactions with Plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse.  Specifically, ERISA §406 provides as follows:

(a) transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**II.     CLASS ALLEGATIONS**

116.     Plaintiffs bring this action on behalf of a class defined as:

All participants in the Plan who invested through the Plan from December 14, 2015 to the present.  Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

117.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

118.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.  The Plan had approximately 11,400 participants at the end of the 2020 Plan year.  The number of class members is so large that joinder of all its members is impracticable.

119.     Common questions of law and fact include:

A.     whether Defendants failed to engage in a proper selection and monitoring process with regard to the Plan investments;

B.     whether Defendants improperly caused the Plan to invest its assets in deficient funds to the exclusion of other available alternatives;

C.      whether the investment decisions made by Defendants were the result of their failure to make those decisions free of any conflicts and solely in the interests of Plan participants;

D.      whether Defendants breached their fiduciary duties to the Plan by not properly reviewing the Plan's administrative fees;

E.      whether Defendants breached their fiduciary duties to the Plan and committed prohibited transactions in violation of ERISA; and

F.      whether the Plan suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions, and if so, the amount of those losses, or undue profits to be disgorged as a result of the fiduciary misconduct alleged herein.

120.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs have no interests that are antagonistic to the claims of the Class.  Plaintiffs understand that this matter cannot be settled without the Court's approval.  Plaintiffs are not aware of another suit pending against Defendants arising from the same circumstances.

121.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous representation of the Class.  Plaintiffs' counsel are experienced in class action and ERISA litigation.

122.    A class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.  The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all class members similarly as Plan participants pursuant to written plan documents and ERISA, which impose

uniform standards of conduct on fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.  Plaintiffs are unaware of any difficulty in the management of this action as a class action.

123.    This Class may be certified under Rule 23(b).

A.      Rule 23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic Rule 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.      Rule 23(b)(2).  This action is suitable as a class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class.

C.      Rule 23(b)(3).  This action is suitable to proceed as a class action under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

#### BREACH OF DUTIES OF PRUDENCE AND LOYALTY
#### AGAINST ALL DEFENDANTS
#### (Violation of 29 U.S.C. §1104(a)(1)(A)–(B))

124.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.   As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

126.   29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration and management of the Plan and the selection and monitoring of Plan investments.

127.   Defendants breached these fiduciary duties by engaging in the conduct described herein.  Among other things, Defendants failed to employ a prudent and loyal process for selecting and monitoring the Plan's investment options by *inter alia*, improperly prioritizing Voya's proprietary investments over superior available options, and/or by failing to evaluate critically or objectively the performance or costs of the Plan's proprietary investments in comparison to other investment options.  In addition, Defendants failed to consider the appropriateness of selecting and retaining certain other Plan investments that were persistently poor performers over the years and/or lacked performance histories, in whole or in part, based on which their suitability for the Plan could be determined if a proper fiduciary process had been in place during the Relevant Period.  As with the Plan's proprietary investments, Defendants failed to replace these deficient funds with suitable alternatives.  Defendants further caused the Plan to pay unreasonable administrative fees, and failed to properly monitor and control those expenses, or ensure that their fiduciary decision-making was not tainted by conflicts of interest vis-à-vis the Plan.

128.    Instead of acting in the best interests of Plan participants, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to the Voya family of companies and to generally promote Voya's business interests.  Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

129.    Further, each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. §1104(a)(1)(B).

130.    As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses during the Relevant Period.

131.    Defendants are liable, under 29 U.S.C. §§1109 and 1132, to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any unjust profits Defendants obtained through the use of Plan assets, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT II

### BREACH OF DUTY TO MONITOR FIDUCIARIES
### AGAINST DEFENDANT VOYA

132.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.    As alleged herein, Defendant Voya is a fiduciary of the Plan pursuant to 29 U.S.C. §1002(21).

134.    Defendant Voya has overall oversight responsibility for the Plan.  Further, upon information and belief, Voya is responsible for appointing and removing members of its Administrative and Investment Committees.  Additionally, upon information and belief, Voya is responsible for retention and oversight of service providers to the Plan and the Plan investment options.  Accordingly, Voya has a fiduciary responsibility to monitor the performance of the Administrative and Investment Committees and their respective members, and to ensure that they have complied with ERISA's statutory standards.  29 C.F.R. §2509.75-8 (FR-17).  Similarly, Voya has a fiduciary responsibility to monitor the performance of Defendants VRIAC (Plan recordkeeper), VITC (Plan trustee), Voya Investment Trust (investment adviser for the Voya Target Trusts), and Voya Investment Management (manager of Voya Stable Value Option), including their respective personnel, to ensure that they comply with ERISA.

135.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and its participants when the monitored fiduciaries are not meeting their fiduciary obligations.

136.    To the extent that Defendant Voya's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

137.    Defendant Voya breached its fiduciary monitoring duties by, among other things:

a.    failing to monitor and evaluate the performance of the Administrative Committee, Investment Committee, VRIAC, VITC, Voya Investment Trust, and Voya

47

Investment Management or have a system in place for doing so, and standing idly by as the Plan suffered significant losses as a result of the Defendants' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor the fiduciary processes of the Administrative Committee, Investment Committee, VRIAC, VITC, Voya Investment Trust, and Voya Investment Management, which would have alerted a prudent fiduciary to the breaches of fiduciary duties and prohibited transactions described herein; and

c.      failing to remove members of the Administrative Committee or the Investment Committee, or employees of VRIAC, VITC, Voya Investment Trust, and Voya Investment Management, whose performance was inadequate in that they continued to maintain imprudent investments within the Plan, continued to cause the Plan to pay excessive administrative expenses, and engaged in transactions prohibited under ERISA, all to the detriment of the Plan and participants' retirement savings.

138.    As a consequence of the foregoing breaches of the duty to monitor, the Plan and its participants suffered millions of dollars of losses during the Relevant Period.

139.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendant Voya is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor other Plan fiduciaries as set forth herein, to restore to the Plan any unjust profits obtained through the use of Plan assets, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT III

### PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST
### AGAINST ALL DEFENDANTS
### (Violation of §406(a)(1) of ERISA, 29 U.S.C. §1106(a)(1))

140.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

141.    ERISA §406(a)(1), 29 U.S.C. §1106(a), prohibits ERISA fiduciaries from causing plans, such as the Plan here, to engage in certain transactions with parties in interest.

142.    As the employer whose employees were covered by the Plan during the Relevant Period, Voya (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).  Voya is also the corporate parent of the Plan sponsor and the other corporate entities named as Defendants herein.

143.    As the Plan recordkeeper, VRIAC is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).  VRIAC is also a party in interest by virtue of being the issuer of the Contract, which is the underlying investment in the Voya Stable Value Option.  *See also* 2020 Form 11-K, noting that VRIAC is a party in interest.

144.    As the Plan trustee during at least a portion of the Relevant Period, VITC is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

145.    As a service provider to the Plan, Voya Investment Trust is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).  During the Relevant Period, Voya Investment Trust served as the investment adviser for Voya Target Trusts.

146.    As a service provider to the Plan, Voya Investment Management is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).  During the Relevant Period, Voya Investment Management served as the manager of the Voya Stable Value Option.

147.   As alleged herein, Defendants Voya, VRIAC, VITC, Voya Investment Trust, and Voya Investment Management are each a fiduciary of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

148.   As alleged herein, Defendants Administrative and Investment Committees and their respective members are also fiduciaries of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

149.   Under ERISA §406(a)(1)(B), 29 U.S.C. §1106(a)(1)(B), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

150.   Under ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

151.   Under ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

152.   Here, Defendant-fiduciaries caused the Plan to engage in numerous transactions with parties in interest to the Plan, in violation of ERISA §406(a)(1)(C)-(D), 29 U.S.C. §1106(a)(1)(C)-(D), including by offering and maintaining proprietary Voya investment options and retaining Voya subsidiaries who are Defendants here to administer, manage, or provide investment advice with regard to these investments, thereby not only generating unreasonable fees and other profits that benefited Voya and/or its subsidiaries (including VRIAC, VITC, Voya

Investment Trust, and Voya Investment Management), all parties of interest *vis-à-vis* the Plan, but also enabled the Company to bolster its investment management business and seed that business with Plan assets, in furtherance of Voya's corporate strategy and business opportunities, thus further profiting the Company, as opposed to advancing the interests of the Plan.  By selecting and retaining Voya Funds, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders. In further violation of these statutory prohibitions, Defendant-fiduciaries caused the Plan to pay unreasonable fees to the Plan's recordkeeper, VRIAC, also a party in interest, and further subjected the Plan to revenue-sharing arrangements with the Voya family of companies through which Voya and its subsidiaries profited to the detriment of Plan participants.

153.    As alleged herein, during the Relevant Period, Voya and/or its subsidiaries (including VRIAC, VITC, Voya Investment Trust, and Voya Investment Management) have collected unreasonable compensation in the form of various direct or indirect fees from the Plan. In particular, Voya and/or its subsidiaries have deducted on a regular basis unreasonable fees from the Plan assets in return for the investment management services, advisory services, or other services provided to the Plan, including but not limited to the administrative services.[26]

154.    Furthermore, during the Relevant Period, Defendant-fiduciaries caused the Plan to invest in Voya Funds to develop and sustain the Company's investment management business (including by using Plan assets as seed money for newly launched proprietary funds).  Defendants maintained a number of Voya Funds in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions.

---

[26]    Upon information and belief, the Plan's administrative fees are subject to a revenue-sharing arrangement among the various Voya entities, including Defendants herein.

155.    Defendant-fiduciaries caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest (Voya, VRIAC, VITC, Voya Investment Trust, and Voya Investment Management), and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest (Voya, VRIAC, VITC, Voya Investment Trust, and Voya Investment Management) of the assets of the Plan.

156.    Additionally, in violation of ERISA §406(a)(1)(B)-(D), 29 U.S.C. §1106(a)(1)(B)-(D), Defendant-fiduciaries violated the prohibited transaction provisions of ERISA when they caused VRIAC to retain the spread profits from the funds held in the Voya Stable Option. Defendant-fiduciaries were aware that the counterparty to these prohibited transactions, VRIAC, was a party in interest under ERISA (*see* 2020 Form 11-K) and that VRIAC received direct or indirect credit from the Plan or direct or indirect assets of the Plan through these spread profits made on the Plan participants' investments in the Voya Stable Value Option.  Further, Voya and/or its subsidiaries received significant compensation through these prohibited transactions by virtue of the profits earned by VRIAC, including the spread between the rate of return on Voya's general account and the crediting rate provided to Plan participants, that was far in excess of Defendants' direct expenses actually incurred.  Defendant-fiduciaries caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest (VOYA and VRIAC), and that such transactions constitute a direct or indirect lending of money or other extension of credit between the Plan and parties in interest (VOYA and VRIAC),

and/or that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest (VOYA and VRIAC) of the assets of the Plan.

111.    As a direct and proximate result of Defendants' prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable investment management fees, advisory fees, administrative fees, and other unreasonable fees and expenses, thereby resulting in millions of dollars in losses to the Plan and its participants, and/or unjust profits for the benefit of the parties in interest, earned not only through the receipt and collection of the fees stemming from the Plan's proprietary investments, but also through the use of Plan assets invested in Voya Funds to develop and sustain the Company's investment management business during the Relevant Period.   Additionally, as a direct and proximate result of Defendants' prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unlawful spread profits to VOYA and/or its subsidiaries from the Plan participants' funds invested in the Voya Stable Value Option, thereby resulting in millions of dollars in losses to the Plan and its participants, and/or unjust profits for the benefit of the parties in interest.

157.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(a)(1), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT IV

### PROHIBITED TRANSACTIONS WITH FIDUCIARIES
### AGAINST ALL DEFENDANTS
### (Violation of §406(b) of ERISA, 29 U.S.C. §1106(b))

158.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

159.    As alleged herein, Defendants Voya, VRIAC, VITC, Voya Investment Trust, and Voya Investment Management are each a fiduciary of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

160.    As alleged herein, Defendants Administrative and Investment Committees and their respective members are also fiduciaries of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

161.    Under ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

162.    Under ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

163.    Under ERISA §406(b)(3), 29 U.S.C. §1106(b)(3), a fiduciary shall not receive any consideration for its personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

A.    **Defendants' Violations of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1)**

164.    Throughout the Relevant Period, Defendant Voya dealt with the assets of the Plan in its own interest or for its own account, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), when it not only caused the Plan to pay unreasonable direct or indirect fees to itself or its subsidiaries, but also unduly profited from the development of its investment management, advisory, and administrative services businesses due to the Plan's investment in the funds challenged herein and associated services offered to the Plan and its participants. Additionally, Defendant Voya dealt with the assets of the Plan in its own interest or for its own account through

controlling and manipulating the crediting rate associated with the Voya Stable Value Option to maximize profits for itself and/or its subsidiaries at the expense of Plan participants and by taking the unlawful spread profits from the funds invested in the Voya Stable Value Option, in violation of 29 U.S.C. §1106(b)(1).

165.    Throughout the Relevant Period, Defendants VRIAC, VITC, Voya Investment Trust, and Voya Investment Management dealt with the assets of the Plan in their own interest or for their own respective accounts, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), when they not only caused the Plan to pay unreasonable direct or indirect fees to themselves or to their corporate parent Voya, but also used the Plan to develop the Company's investment management, advisory, and administrative services businesses due to the Plan's investment in the funds challenged herein and associated services offered to the Plan and its participants.

166.    Throughout the Relevant Period, Defendant VRIAC dealt with the assets of the Plan in its own interest or for its own account, or in the interest and for the account of its corporate parent Voya, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), through controlling and manipulating the crediting rate associated with the Voya Stable Value Option to maximize profits for itself and/or its corporate parent Voya at the expense of Plan participants and by taking the unlawful spread profits from the funds in the Voya Stable Value Option, in violation of 29 U.S.C. §1106(b)(1).

167.    Throughout the Relevant Period, Defendants VITC (the Plan trustee) and Voya Investment Management (the manager of Voya Stable Value Option) dealt with the assets of the Plan in their own interest or for their own respective accounts, or in the interest and for the account of its corporate parent Voya, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), when they enabled Defendants Voya and VRIAC to control and manipulate the crediting rate associated with

Voya Stable Value Option to maximize profits for Voya and/or its subsidiaries at the expense of Plan participants and to take the unlawful spread profits from the funds in the Voya Stable Value Option, in violation of 29 U.S.C. §1106(b)(1).

168.    Throughout the Relevant Period, the Administrative and Investment Committee Defendants dealt with the assets of the Plan in their own interest, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), when they not only caused the Plan to pay unreasonable direct or indirect fees to the Company or its subsidiaries, but also used the Plan to develop the Company's investment management, advisory, and administrative services businesses due to the Plan's investment in the funds challenged herein and associated services offered to the Plan and its participants.  Additionally, the Administrative and Investment Committee Defendants dealt with the assets of the Plan in their own interest, when they enabled Defendants Voya and VRIAC to control and manipulate the crediting rate associated with the Voya Stable Value Option to maximize profits for Voya and/or its subsidiaries at the expense of Plan participants and to take the unlawful spread profits from the funds in the Voya Stable Value Option, in violation of 29 U.S.C. §1106(b)(1).  Upon information and belief, every member of the Administrative and Investment Committees was a Voya executive, whose compensation and promotion levels increased when they acted to increase revenue for the Company and to bring about further business opportunities for the Company.

**B.    Defendants' Violations of ERISA §406(b)(2), 29 U.S.C. §1106(b)(2)**

169.    Throughout the Relevant Period, Defendants named in this Count, acting on behalf of the Company, whose corporate interests were adverse to those of the Plan and its participants, in transactions involving the Plan, violated ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain investment funds that not only generated unreasonable revenue for

the Company or its subsidiaries, but also enabled the Company to develop its investment management, advisory, and administrative services businesses in furtherance of the Company's business ventures and opportunities to the detriment of the Plan and its participants.  Additionally, Defendants named in this Count, acting on behalf of the Company, whose corporate interests were adverse to those of the Plan and its participants, in transactions involving the Plan, violated 29 U.S.C. §1106(b)(2), by causing Defendants Voya and VRIAC to control and manipulate the crediting rate associated with the Voya Stable Value Option to maximize profits for Voya and/or its subsidiaries at the expense of Plan participants and to take the spread unlawful profits from the funds in the Voya Stable Value Option.

**C.      Defendants' Violations of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3)**

170.    Throughout the Relevant Period, Defendant Voya received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).  These transactions took place on a periodic basis throughout the Relevant Period when unreasonable fees were received and collected in return for the investment management services, advisory services, administrative services, or other services provided to the Plan.  These transactions also took place during the Relevant Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investments in the funds challenged herein.  Additionally, Defendant Voya received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of 29 U.S.C. §1106(b)(3) by controlling and manipulating the crediting rate associated with the Voya Stable Value Option to maximize profits for itself and/or its subsidiaries at the expense of Plan participants and by taking the unlawful spread profits from the

funds in the Voya Stable Value Option.  Voya received significant revenues from these prohibited transactions, arising out of this course of self-dealing.

171.    Throughout the Relevant Period, Defendants VRIAC, VITC, Voya Investment Trust, and Voya Investment Management received and collected consideration for their own respective accounts or for the account of their corporate parent, Voya, in connection with the transactions involving the assets of the Plan, in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).  These transactions took place on a periodic basis throughout the Relevant Period when unreasonable fees were received and collected in return for the investment management services, advisory services, administrative services, or other services provided to the Plan.  These transactions also took place during the Relevant Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investments in the funds challenged herein.

172.    Throughout the Relevant Period, Defendant VRIAC received and collected consideration for its own account or for the account of its corporate parent, Voya, in connection with the transactions involving the assets of the Plan, in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3), through controlling and manipulating the crediting rate associated with the Voya Stable Value Option to maximize profits for itself and/or its corporate parent Voya at the expense of Plan participants and by taking the unlawful spread profits from the funds in the Voya Stable Value Option, in violation of 29 U.S.C. §1106(b)(3).

173.    Based on the foregoing facts, Defendants, each a fiduciary of the Plan, violated 29 U.S.C. §1106(b).  These prohibited transactions took place on an ongoing basis throughout the Relevant Period, when Voya or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of Voya's investment management business, advisory business, and administrative services business due to

the inclusion of the challenged funds in the Plan and related services offered to the Plan and its participants. These prohibited transactions further took place on an ongoing basis throughout the Relevant Period, when Voya and VRIAC controlled and manipulated the crediting rate associated with the Voya Stable Value Option to maximize profits for themselves at the expense of Plan participants and by taking the unlawful spread profits from the funds in the Voya Stable Value Option.

174.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid unreasonable fees and expenses, in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants, and/or unjust profits to the Plan fiduciaries. Additionally, as a direct and proximate result of Defendants' prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unlawful spread profits to VOYA and/or its subsidiaries from the Plan participants' funds invested in the Voya Stable Value Option.

175.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(b), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

<u>**COUNT IV**</u>

**CO-FIDUCIARY LIABILITY**
**AGAINST ALL DEFENDANTS**
**(Violation of §405(a) of ERISA, 29 U.S.C. §1105(a))**

176.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

177.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability, which it may have under any other provision of ERISA, if:

1)      it participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

2)      by its failure to comply with ERISA §404(a)(1) in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

3)      it knows of a breach by another fiduciary and fails to make reasonable efforts to remedy the breach.

178.    Defendants were all fiduciaries of the Plan within the meaning of ERISA §405(a), 29 U.S.C. §1105(a).

179.    Each Defendant knew of each breach of fiduciary duty by the other Defendants alleged herein, arising out of the imprudent and disloyal management of the Plan investments and the prohibited transaction violations that took place during the Relevant Period. Yet, Defendants knowingly participated in these fiduciary breaches and prohibited transactions, breached their own duties, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy such other fiduciary breaches and prohibited transactions.

180.    As some, if not all of the members of the Administrative Committee and the Investment Committee were officers, directors, or employees of Defendant Voya, their knowledge is imputed to the Company.  The knowledge of the respective employees of VRIAC, VITC, Voya Investment Trust, and Voya Investment Management is also imputed to their corporate parent Voya.  Defendant Voya knew of the breaches of fiduciary duty and prohibited transactions by each of the other Defendants arising out of the imprudent and disloyal management of the Plan investments and the prohibited transaction violations that took place during the Relevant Period. Yet, Defendant Voya knowingly participated in these fiduciary breaches and prohibited

transactions, breached its own duties to the Plan, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy these fiduciary breaches and prohibited transactions.

181.    As a direct and proximate result of these co-fiduciary violations by Defendants, the Plan and its participants suffered millions of dollars in losses during the Relevant Period.

182.    Defendants are liable under 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan all losses resulting from the aforementioned co-fiduciary violations and restore to the Plan any unjust profits obtained through the use of Plan assets and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    A declaration that Defendants breached their fiduciary duties of prudence and loyalty under ERISA;

B.    A Declaration that Voya breached its fiduciary duty to monitor under ERISA;

C.    A declaration that Defendants violated ERISA §406 and participated in prohibited transactions;

D.    An order compelling the disgorgement of all unjust profits incurred, directly or indirectly, by Voya and its subsidiaries and affiliates, as a result of the Defendants' violations of ERISA;

E.    An order compelling Defendants to restore all losses to the Plan arising from the Defendants' violations of ERISA;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

G.     Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to manage and administer the Plan, and rescission of the Plan's investments in Voya Funds and any other imprudent investments;

H.     An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

I.     An order enjoining Defendants collectively from any further violations of their ERISA duties;

J.     An order awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

K.     An order awarding such other and further relief as the Court deems equitable and just.

Dated: December 14, 2021

SCOTT+SCOTT ATTORNEYS AT LAW LLP

*s/* Amanda F. Lawrence
Amanda F. Lawrence
(CT 27008)
P.O. Box 192
156 South Main Street
Colchester, Connecticut 06415
Telephone: 860-537-5537
alawrence@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Garrett W. Wotkyns
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514
gwotkyns@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Tanya Korkhov
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444

tkorkhov@scott-scott.com

PEIFFER WOLF CARR KANE & CONWAY
Joseph C. Peiffer
Kevin P. Conway
Jamie L. Falgout
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: 504-523-2434
jpeiffer@peifferwolf.com
kconway@peifferwolf.com
jfalgout@peifferwolf.om

*Attorneys for Plaintiffs*